# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

TIMOTHY CONKLIN,

Plaintiff,

v.                                                   3:16-CV-1361
                                                     (ATB)

COMM'R OF SOC. SEC.,

Defendant.

LOUISE MARIE TARANTINO, ESQ., Counsel for Plaintiff
PETER W. JEWETT, Special Asst. AUSA for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## MEMORANDUM DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On May 15, 2013, plaintiff filed an application for Supplemental Security Income ("SSI"). (Administrative Transcript ("T") at 202-208).  The application was denied initially on October 1, 2013. (T. 140-51).  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 9, 2014. (T. 96-124). On October 7, 2013, ALJ Dale Black-Pennington found plaintiff was not disabled. (T. 80-95).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on September 12, 2016. (T. 1-4).

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be
> hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity.  If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities.  If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations.  If the claimant has such an impairment, the
> [Commissioner ] will consider him disabled without considering
> vocational factors such as age, education, and work experience . . . .
> Assuming the claimant does not have a listed impairment, the fourth
> inquiry is whether, despite the claimant's severe impairment, he has the

residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B.     Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III.  <u>FACTS</u>

Plaintiff was born in 1968, making him 44 years old at the application date and 46 years old at the date of the ALJ's decision. Plaintiff reported completing the eighth grade. Generally, plaintiff alleges disability due to chronic obstructive pulmonary disease ("COPD"), back pain, degenerative joint disease ("DJD"), and hypertension.

Defendant has generally incorporated the statement of facts as outlined in plaintiff's brief, "with the exception of any legal conclusions and characterizations of the facts . . . ." (Def.'s Br. at 3) (Dkt. No. 16) (citing Pl.'s Br. at 2-10) (Dkt. No. 15). Defendant has also incorporated the statement of facts contained in the ALJ's decision. (*Id.*) (citing T. 83-91). This court will also incorporate plaintiff's facts and the ALJ's statement of facts with any exceptions as noted below.

The record contains a number of medical records, many of which are relevant to this court's decision. Rather than reciting this evidence at the outset, the court will

discuss the relevant details below, as necessary to address the issues raised by plaintiff.

## IV. **THE ALJ'S DECISION**

In her decision, the ALJ found first that plaintiff has not engaged in substantial gainful activity since the application date. (T. 85). At step two of the sequential analysis, the ALJ found that plaintiff's COPD, asthma, back pain, and hypertension are severe impairments. (T. 85-86). At step three, the ALJ found that plaintiff's severe impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1 (the "Listings"). (T. 86-87). Specifically, the ALJ considered Listings 1.04 (disorders of the spine), 3.02 (chronic respiratory insufficiency), 3.03 (asthma), and 4.00 (cardiovascular impairments). (*Id*.) At step four, the ALJ found that plaintiff has the residual functional capacity ("RFC") to perform

> light work, as defined in 20 CFR 416.967(b), except that the claimant can stand and walk for 20 minutes [sic] intervals for six hours during the course of an eight hour workday; can sit for 30 minutes [sic] intervals for six hours during the course of an eight hour workday; can occasionally bend, climb ramps and stairs; must avoid exposure to dust, fumes, smoke, temperature extremes, and other known respiratory irritants; must avoid climbing ladders, ropes and scaffolds; and must avoid unprotected heights, vibrations and heavy moving mechanical parts.

(T. 87.) The ALJ also found that plaintiff has no past relevant work. (T. 90.) At step five of the sequential analysis, the ALJ found that plaintiff remains able to perform a significant number of other jobs in the national economy, such as tanning salon attendant, office helper, and photocopy machine operator. (T. 90-91.) The ALJ therefore concluded that plaintiff is not disabled.

## V.    ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.   The evidence submitted to the Appeals Council should have been considered new, material, and probative. Therefore, the case should be remanded to the ALJ to properly consider the new evidence. (Pl.'s Br. at 12-15).

2.   The ALJ's RFC determination was not supported by substantial evidence. (Pl.'s Br. at 16-23).

3.   The hypothetical question posed to the Vocational Expert ("VE") was erroneous. Therefore, the ALJ's step five determination was erroneous. (Pl.'s Br. at 20-21).

4.   The jobs identified by the VE do not exist in sufficient numbers in the region where plaintiff lives.  Thus, the ALJ's step five determination was not supported by substantial evidence. (Pl.'s Br. at 23).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 5-11).  Plaintiff was granted permission to file a reply brief. (Dkt. No. 19).  For the reasons stated below, the court concludes that the ALJ erred in evaluating the plaintiff's RFC and his credibility, and that the ALJ's  determination was not supported by substantial evidence.

## VI.    EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

### A.    Legal Standards

Under 20 C.F.R. §§ 404.970(b) and 416.1470(b), a plaintiff is authorized to submit new evidence to the Appeals Council without demonstrating good cause. *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 1996).  Under the regulations, the Appeals Council must consider new and material evidence if it relates to the period on or before the date of the administrative law judge hearing decision. *Id*.  *See Stratton v. Colvin*, 51 F. Supp.

3d 212, 218 (N.D.N.Y. 2014) (citing 20 C.F.R. § 404.970(b)). "Once evidence is added to the record, the Appeals Council must then consider the entire record, including the new evidence, and review a case if the 'administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 86 (2d Cir 2015) (quoting 20 C.F.R. § 404.970(b)). Even if the Appeals Council denies review, evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record to be considered on judicial review. *Perez*, 77 F.3d at 45. The role of the district court is to determine if the Appeals Council erred when it determined that the new evidence was insufficient to trigger review of the ALJ's decision. *Sears v. Colvin*, No. 8:12-CV-570 (MAD/ATB), 2013 WL 6506496, at *5 (N.D.N.Y. Dec. 12, 2013) (citing *Woodford v. Apfel*, 93 F. Supp. 2d 521, 528 (S.D.N.Y. 2000)).

If the Appeals Council fails to consider new, material evidence, "the proper course for the reviewing court is to remand the case for reconsideration in light of the new evidence." *Shrack v. Astrue*, 608 F. Supp. 2d 297, 302 (D. Conn. 2009) (citation omitted); *Sears v. Colvin*, 2013 WL 6506496, at *5, 7 (a sentence four remand is warranted when the Appeal Council failed to adequately address additional evidence that could potentially fill "significant gaps in the record . . . [and could] plainly help to assure the proper disposition of a claim") (citation omitted).

Evidence is "material" if there is "a reasonable possibility that the new evidence would have influenced the Commissioner to decide claimant's application differently." *Lisa v. Sec'y of Dep't of Health and Human Servs.*, 940 F.2d 40, 43 (2d Cir. 1991).

"Materiality requires that the new evidence not concern 'a later-acquired disability or the subsequent deterioration of the previous non-disabling condition.'" *Pearson v. Astrue*, No. 1:10-CV-521 (MAD), 2012 WL 527675, at *11 (N.D.N.Y. Feb. 17, 2012) (citing *Estevez v. Apfel*, No. 97 Civ. 4034, 1998 WL 872410, at *7 (S.D.N.Y. Dec. 14, 1998)).

"[W]hen claimants submit to the Appeals Council treating-physician opinions on the nature and severity of their impairments during the relevant period of disability, 'the treating physician rule applies, and the Appeal's Council must give good reasons for the weight accorded to' that opinion." *Djuzo v. Comm'r of Soc. Sec.*, No. 5:13-CV-272 (GLS/ESH), 2014 WL 5823104, at *3 (N.D.N.Y. Nov. 7, 2014) (citing, *inter alia*, *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).[1] Further, "[i]t is insufficient for the Appeals Council to merely acknowledge that they reviewed new evidence from a treating physician without providing such reasoning." *Seifried ex rel. A.A.B. v. Commissioner of Soc. Sec.*, No. 6:13-CV-347 (LEK/TWD), 2014 WL 4828191, at *4 (N.D.N.Y. Sept. 29, 2014) (citation omitted).

## B.    Application

In this case, the Appeals Council was provided with records, including treatment notes from UHS Delaware Valley Hospital ("DVH") (dated May 7, 2016, to May 9, 2016) and Bassett Healthcare (dated May 5, 2016, to May 17, 2016), and an RFC

---

[1] "[A] treating physician's report is generally given more weight than other reports and . . . a treating physician's opinion will be controlling if it is "well-supported by medically acceptable [evidence] and is not inconsistent with the other substantial evidence in [the] record." *Snell v. Apfel*, 177 F.3d at 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(d)). If the ALJ rejects the report of a treating physician, he must properly analyze the reasons that the report is rejected. *Halloran v. Barnhart*, 362 F.3d 28, 32-33 (2004).

evaluation, from one of plaintiff's treating physicians, Dr. Michael Freeman (dated May 27, 2016). (T. 2, 9-77.) The Appeals Council stated that the ALJ's decision covered plaintiff's condition through March 3, 2015, and found that the new evidence related to a later time, and therefore did not apply to the time period in question. (T. 2). Thus, the new evidence would not affect the ALJ's decision finding that plaintiff was not disabled on or before March 3, 2015. (*Id.*) This court agrees.

The records from Bassett Healthcare indicate that plaintiff was seen on May 5, 2016, by Shelby S. Cooper, M.D., for a reportedly "mild blockage," and pain and ecchymosis of his left foot and ankle which had been present for the previous *three to four weeks*. (T. 18-20). Dr. Cooper diagnosed Peripheral Artery Disease ("PAD"),[2] ischemic pain of the left foot, and thromboembolism. (T. 20). Dr. Cooper prescribed Keflex and Plavix and instructed plaintiff to return in about seven days for a follow-up after additional studies. (T. 18-21). On May 7, 2016, plaintiff went to the emergency room at DVH with vomiting and was diagnosed with possible venous insufficiency. (T. 60-61).

Plaintiff was transferred from DVH to Bassett Healthcare on May 9, 2016, because of altered mental status,[3] severe hyponatremia,[4] and reportedly worsening bilateral leg pain. (T. 18-28). At Bassett, he was admitted to the intensive care unit

---

[2] PAD is a "common circulatory problem in which narrowed arteries reduce blood flow to [the] limbs." https://www.mayoclinic.org/diseases-conditions/peripheral-artery-disease/symptoms-causes/syc-20350557.

[3] According to his girlfriend, plaintiff was having hallucinations and not being himself. (T. 21).

[4] Hyponatremia is a condition that occurs when the level of sodium in your blood is abnormally low. https://www.mayoclinic.org/diseases-conditions/hyponatremia/symptoms-causes/syc-20373711.

("ICU") for hyponatremia that was noted to be "faintly symptomatic [and] likely chronic." (T. 28-43, 32). He reported bilateral leg pain for a few weeks, left foot ecchymosis for about four weeks, and a 40-pound weight loss in the past month (per his significant other). (T. 33, 36, 43). Plaintiff reported he "was in the usual state of health 3 weeks back when [he] started having bilateral leg pain left more than right with discoloration." (T. 46). During the hospital admission interview, plaintiff denied heavy alcohol consumption, thus the report noted that beer potomania (also known as beer drinker's hyponatremia) was unlikely. (T. 32). Tests done during plaintiff's admission included a chest x-ray, which showed COPD, and PAD testing, which showed *mild* arterial occlusive disease and a small pericardial effusion. (T. 32, 50, 53-57).

On May 17, 2016, plaintiff was discharged with a stable sodium level and resolved confusion. (T. 46-47). He was to follow-up with Dr. Freeman as soon as possible. (T. 46). On discharge, ICU staff noted alcohol withdrawal, along with severe hyponatremia due to beer potomania.[5] (T. 47). Plaintiff was instructed to not drink alcohol/beer. (*Id.*) He was also diagnosed with peripheral vascular disease[6] ("PVD"), as confirmed by ankle-brachial index testing that showed *mild* occlusive disease in the right ankle and normal findings in the left ankle. (*Id*.) CT angiography was recommended, but plaintiff refused any further testing and insisted on going home.

---

[5] Evidently, plaintiff's statement to the admitting medical personnel that he was not drinking was not true. (*See* T. 32).

[6] PVD and PAD are the same impairment. https://stanfordhealthcare.org/medical-conditions /blood-heart-circulation/peripheral-vascular-disease.html

(*Id.*)  Upon discharge, plaintiff was directed to follow up with Dr. Freeman within one week. (T. 46).

Dr. Freeman's May 27, 2016, RFC evaluation states that plaintiff's primary diagnosis was cerebral vascular accident[7] and secondary diagnoses were COPD and PVD. (T. 9).  There is no mention of plaintiff's back impairment.  Dr. Freeman indicated exertional limitations including occasional and frequent lifting and/or carrying less than 10 pounds, standing and/or walking less than two hours in an eight-hour workday, sitting less than six hours in an eight-hour workday, and unlimited pushing and/or pulling. (T. 10).  Dr. Freeman noted that plaintiff had a recent massive electrolyte abnormality of life-threatening magnitude requiring admission to the ICU and that plaintiff was oxygen-dependent with malnourishment. (*Id.*)

In an RFC evaluation form, dated May 27, 2016, Dr. Freeman found that plaintiff's postural limitations included no climbing, balancing, stooping, kneeling, crouching, or crawling. (T. 11).  He also found communicative limitations including limited hearing and speaking.[8] (T. 13).  He noted "N/A" regarding environmental

---

[7] It is unclear where Dr. Freeman obtained the diagnosis of cerebral vascular accident. Cerebral Vascular Accident is the medical term for "stroke." https://www.ncbi.nlm.nih.gov/pubmedhealth /PMHT0024234/.  Plaintiff's May 17, 2016 discharge papers specifically state that "Patient did ***not*** have a hospital diagnosis of AMI, Heart Failure, ***Stroke***, or Child Asthma." (T. 49) (emphasis added). Plaintiff's confusion upon hospital admission was associate with the hyponatrema due to alcohol abuse. (T. 46-47).

[8] Dr. Freeman did not explain why he checked the boxes indicating that both hearing and speech were "limited," even though the form asks the doctor to "[d]escribe how the faculties checked "limited" are impaired.  Also explain how and why the evidence supports your conclusions . . . . Cite the specific facts upon which your conclusions are based." (T. 13).  This space is empty. (*Id.*)  The court notes that the only time that the medical records indicate that plaintiff had difficulty hearing and speaking was when he was admitted with confusion, relating to the potomania, which was resolved upon discharge.  Clearly Dr. Freeman was relying on recent events in is determination.

limitations as "[plaintiff] can barely stand." (*Id*.)  He noted he had discussed plaintiff's condition with the ICU attending physician Dr. Kramer and they had "not seen such a profoundly disabled" man. (T. 16).  Dr. Freeman indicated plaintiff was "incapable of any exertional tasks" and "that would include sedentary employment." (*Id*.)

The Appeal's Council findings are supported by substantial evidence.  All the records submitted to the Appeals Council relate to plaintiff's 2016 hospitalization, and his admittedly worsening condition.  Records dated after the ALJ's decision may in some cases relate back to the relevant time period if they pertain to the same condition previously complained of. *Brown v. Apfel*, 174 F.3d 59, 64-65 (2d Cir. 1966).  The 2016 hospital records in this case, however, relate to plaintiff's hospitalization for hyponatremia.

It is true that on September 3, 2013, prior to the ALJ's decision, Dr. Magurno hinted at the diagnosis of "probable" PAD, based upon the lack of a pedal pulse on the right side. (T. 329).  However, there was no follow up prior to the ALJ's decision, and in any event, the testing contained in the new evidence, which is dated more than a year after the ALJ's decision, showed that the arterial occlusive disease was only in one leg, and it was "mild." (T. 53).  Additionally, the records from Dr. Cooper at Bassett Healthcare, dated May 5, 2016 state that plaintiff "interestingly" had a "Doppler study done at [DVH] 2-1/2 weeks ago [which] showed normal index on the right of 1 and mild [PAD] on the left with an index of 0.85. . . ."  Thus, the PAD diagnosis, while perhaps confirming Dr. Magurno's belief that plaintiff had PAD would not have changed the ALJ's decision because even in 2016, the impairment was classified as

"mild."

Dr. Freeman's RFC evaluation, dated May 27, 2016 was completed less than two weeks after the plaintiff's hospitalization, more than one year after the ALJ's decision, and reflects the plaintiff's worsened condition after the 2016 hospitalization. Dr. Freeman's previous report does not reflect such extreme limitations. On December 5, 2014, Dr. Freeman wrote a letter that was considered by the ALJ. (T. 456). The letter states that Dr. Freeman had seen plaintiff "several times" in the past year and that he had "enough professional experience to say that he legitimately does seem to have *a degree of disability that is total* . . . ." (T. 456). The letter also states that plaintiff has "severe COPD," and it was doubtful that he would be "non-oxygen dependent much longer." (*Id.*) According to Dr. Freeman plaintiff's COPD, combined with his severe osteopenia and degenerative joint disease" made him "unemployable." (*Id.*) Dr. Freeman conceded in the letter that he was "aware that there is a legal process for such determinations," together with "guidelines," and "procedure," but that his was "an honest contributory medical opinion to weigh in on the process." (*Id.*) There was no specific RFC that accompanied Dr. Freeman's report. Dr. Freeman's conclusory statement in 2014 that plaintiff had "a degree" of disability that is "total," bears no relationship to the standard for Social Security Disability, and does not reflect the degree of disability that Dr. Freeman was discussing in 2016 after plaintiff's hospitalization.

Dr. Freeman's 2016 RFC evaluation noted severe restrictions on almost every function listed. (T. 10). The restrictions would not allow plaintiff to perform even

sedentary work. His explanation states that "plaintiff has extensive vasculopathy, **recent** massive electrolyte abnormality of life threatening magnitude, end stage emphysema." (*Id.*) (emphasis added). Dr. Freeman states that plaintiff "survived ICU care at [Bassett]," and that plaintiff did not have "any ability to work." (*Id.*) Dr. Freeman also mentioned oxygen dependency and malnurishment. (*Id.*) In the section entitled "Environmental Limitations," Dr. Freeman did not check any of the boxes, rather he hand-wrote "N/A he can barely stand." (T. 13). Finally, Dr. Freeman states that he has cared for plaintiff and "still see him." Dr. Freeman states that he discussed plaintiff's condition with the Attending Physician of the ICU, and they determined that in their combined experience, they had "not seen such a profoundly debilitated man," and that "10/10 physicians would [find that] he is incapable of any exertional tasks - that would include sedentary employment."

It is clear from the 2016 report that Dr. Freeman was discussing plaintiffs then-current condition, and that the plaintiff's condition was made considerably worse due to the condition which required hospitalization. Dr. Freeman's 2014 report stated that the plaintiff had "some degree of disability that was total,"[9] while the 2016 report states that plaintiff was "profoundly debilitated" and could "hardly walk." The 2016 treatment records and Dr. Freeman's opinion from May 2016 concern treatment occurring more than a year after the ALJ's March 2015 decision. The hospitalization

---

[9] The court would also point out that Dr. Freeman's conclusory statement that plaintiff had "some degree of disability that is total" was not binding on the ALJ in any event. *See Raymer v. Colvin*, No. 14-CV-6009, 2015 WL 5032669, *4 n.4 (W.D.N.Y. 2015) ("the ALJ was not obligated to accord significant weight to [treating physician's] conclusory opinions that [plaintiff's] medical impairments prevented him from working") (collecting cases). In any event, the doctor himself recognized that there was a legal standard that plaintiff was required to meet. (T. 456).

was largely due to hyponatremia, related to beer potomania rather than a clear continuation or exacerbation of plaintiff's back and leg pain or even his new diagnoses of PAD or PVD. The Appeals Council properly determined that plaintiff's new evidence related to a period after the ALJ's decision on March 3, 2015, and therefore was not material to the relevant time period. (T. 2.) Thus, the Appeals Council decision that the new evidence did not relate back to the period considered by the ALJ is supported by substantial evidence. The court will now turn to a consideration of the ALJ's opinion.

## VII. <u>RFC and Credibility</u>

### A. **Legal Standards**

#### 1. **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999)

(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Martone*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

The ALJ has the responsibility of reviewing all the evidence before her, resolving inconsistencies, and making a determination consistent with the evidence as a whole.  *See Bliss v. Colvin*, 13-CV-1086, 2015 WL 457643, at *7 (N.D.N.Y. Feb. 3, 2015) ("It is the ALJ's sole responsibility to weigh all medical evidence and resolve material conflicts where sufficient evidence provides for such."); *accord Petell v. Comm'r of Soc. Sec.*, No. 12-CV-1596, 2014 WL 1123477, at *10 (N.D.N.Y. Mar. 21, 2014).  In assessing a claimant's RFC, an ALJ is entitled to rely on opinions from both examining and non-examining State agency medical consultants because these consultants are qualified experts in the field of social security disability.  20 C.F.R. §§ 416.913a, 416.927(e).

### 2.    Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the

objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (citation omitted). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures

taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.     Application

In this case, the ALJ stated that she was affording great weight to the September 2013 opinion of consultative examiner Dr. Magurno. (T. 89.)  Dr. Magurno's opined limitations are contained in the medical source statement section of her report: "The claimant should avoid dust, fumes, and other known lung irritants. ***There should be no more than mild levels of physical exertion***. There are also moderate limitations for bending." (T. 329.) (emphasis added).  However, in her decision, the ALJ stated that "[a]lthough [plaintiff] testified he is able to walk for no more than 30 to 40 seconds, he reported to Dr. Magurno that he was able to walk a couple hundred yards.  It was her opinion that [his] ability to engage in physical exertion was ***no more than mildly limited (Exhibit B4F)***." (T. 89.) (emphasis added).  Earlier in her decision, the ALJ stated, "Dr. Magurno reported that the claimant had a ***mildly limited ability to engage in physical exertion***.  She found that his ability to bend was moderately limited.  She advised the claimant to avoid exposure to dust, fumes and other lung irritants." (T. 87.)  The ALJ's interpretation of the limitation for "no more than mild . . . physical exertion" as an indication that plaintiff is "no more than mildly limited" is therefore erroneous.

The ALJ is required to provide a rationale in the written decision sufficient to allow the court to conduct an adequate review of her findings. *Hamedallah ex rel. E.B.*

*v. Astrue*, 876 F. Supp. 2d 133, 142 (N.D.N.Y. 2012) (quoting *Morgan on behalf of Morgan v. Chater*, 913 F. Supp. 184, 188-89 (W.D.N.Y. 1996)). *See Booker v. Astrue*, No. 07-CV-0646, 2011 WL 3735808, at *5 (N.D.N.Y. Aug 24, 2011) ("The crucial factors in an ALJ's decision must be set forth in sufficient detail as to enable meaningful review by the court.") (citing Ferraris v. Heckler, 728 F.2d at 587); *Hickman ex rel. M.A.H. v. Astrue*, 728 F. Supp. 2d 168, 173 (N.D.N.Y. 2010) ("The ALJ must 'build an accurate and logical bridge from the evidence to [his] conclusion to enable a meaningful review.'") (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).

In explaining the weight afforded to Dr. Magurno's opinion, the ALJ stated only that the "opinion regarding the claimant's functional capacity is consistent with clinical findings and diagnostic studies." (T. 89.) Without further explanation from the ALJ, the Court cannot conclude that an RFC for a modified range of light work with 20-minute intervals for standing/walking and 30-minute intervals for sitting is actually consistent with Dr. Magurno's opinion that plaintiff should do no more than mild levels of physical exertion (an opinion to which the ALJ purported to afford great weight). The ALJ's multiple incorrect notations regarding Dr. Magurno's medical source statement illustrate that, while she correctly assessed Dr. Magurno's opinion regarding moderately limited bending, she clearly misread the portion of the opinion for "no more than mild levels of physical exertion," a mistake that calls into question whether Dr. Magurno's opinion would provide substantial evidence to support the RFC for light work. (T. 87, 89.) As a result, the court is unable to determine whether the RFC

19

finding is supported by substantial evidence.

Defendant concedes that the ALJ incorrectly phrased Dr. Magurno's opinion regarding exertional limitations, but argues that such error is harmless because the ALJ restricted plaintiff to an "extremely limited" RFC. (Dkt. No. 16, at 7 [Def.'s Mem. of Law].) However, as discussed above, it is not clear that the ALJ properly considered Dr. Magurno's opined exertional limitations, or that the RFC would be consistent with the limitations Dr. Magurno actually opined. The ALJ afforded great weight to an opinion she appears to have misread and subsequently relied on that mistake when determining plaintiff's RFC. *See Rivera v. Astrue*, No. 10-CV-4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (finding that "[w]here the ALJ misreads the substance of such evidence or confuses different components of the record before him, remand is appropriate.") (citing *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010)).

It is not clear that "no more than mild" exertion would allow the plaintiff to perform light work, even with the additional restrictions placed upon the light work by the ALJ in her RFC. This court's determination is further supported by the ALJ's implicit indication that she relied heavily, if not solely, on Dr. Magurno's opinion because she found that the other opinions of record from Valentina Davydov, M.D., and Dr. Freeman were not "of significant probative value" or not "entitled to significant weight." (T. 89.)

In addition to misreading Dr. Magurno's opinion relative to plaintiff's RFC, the ALJ used Dr. Magurno's alleged finding as one factor in determining that plaintiff's testimony was "not fully credible." (*See* T. 88-89) (It was [Dr. Magurno's] opinion that

the claimant's ability to engage in physical exertion was no more than mildly limited (Exhibit B4F). Based on the foregoing, the [ALJ] does not find that the testimony given by the claimant at hearing is fully credible.")

In *Genier*, the ALJ misunderstood the plaintiff's testimony at the hearing. 606 F.3d at 50. The court stated that "the ALJ's decision was impaired by a misunderstanding of Genier's testimony at the hearing . . . ." *Id.* The court held that "[b]ecause the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all of the relevant medical and other evidence'" . . . and cannot stand." *Id.* (citing 20 C.F.R. § 404.1345(a)(3)). In this case, the ALJ's misreading of Dr. Magurno's statement appears to have affected both the RFC determination and the credibility determination. Therefore, this error is not harmless, and remand is necessary for proper consideration of the medical evidence.

Plaintiff also argues that the ALJ's consideration of plaintiff's smoking was not supported by substantial evidence. In making a determination that plaintiff's symptoms were not "as severe as alleged," the ALJ cited plaintiff's failure to "cease cigarette smoking." (T. 88). The ALJ cited Dr. Freeman's November 2014 report, in which the doctor noted that plaintiff "acknowledged that he continued to smoke," and he testified that "he continued to smoke as recently as one month prior to the hearing." (*Id.*) The ALJ stated that "if the claimant's symptoms were as severe as alleged, he would have complied with medical recommendations much sooner." (*Id.*)

While it is true that a plaintiff's smoking may be considered in a credibility

assessment, the objective medical evidence must support that determination. *Beshaw v. Comm'r of Soc. Sec.*, 15-CV-0556, 2016 WL 4382702, at *13 (comparing *Goff v. Astrue*, 993 F. Supp. 2d 114, 128 (N.D.N.Y. 2012) with *Kemp v. Comm'r of Soc. Sec.*, 10-CV-1244, 2011 WL 3876526, *9 (N.D.N.Y. Aug. 11, 2011), *Report and Recommendation adopted by* 2011 WL 3876419 (N.D.N.Y. Aug. 31, 2011)).  In this case, although the ALJ discusses objective evidence of plaintiff's COPD, he does not relate this objective evidence to plaintiff's credibility determination, and his conclusion that plaintiff would have quit sooner if the symptoms had been as severe as alleged is not supported by substantial evidence.

On August 12, 2013, Dr. Regina Frants, M.D., from Southern Tier Pulmonary, examined plaintiff at the request of his then-primary care provider, Valentina Davydov. (T. 322-24).  Dr. Frants noted that, although plaintiff was a "current smoker," he had been "smoking for 30 years, up to 3 packs a day.  Over the period of last [sic] six months, he smokes 2 cigarettes a day, he is motivated to quit smoking." (T. 322).  Plaintiff had substantially reduced his cigarette use.

Upon examination, Dr. Frants stated that plaintiff's thorax was symmetrical, and there was no dullness to percussion. (T. 323).  However, the diaphragmatic excursion was "diminished bilaterally," his breath sounds were "significantly diminished, especially over the upper lung zones, better transmitted over lower lobes," and "[s]cattered expiratory wheezing [was] noted, [with] no crackles." (*Id.*)  Dr. Frants diagnosed Chronic Obstructive Asthma Unspecified, presently "uncontrolled" and "clinically, at least moderately severe;" COPD, "clinically severe"; and "Tobacco Use

Disorder." (T. 323). The doctor recommended that plaintiff "[t]ry to quit smoking." (T. 324). Dr. Frants stopped plaintiff's Advair, but prescribed a variety of other inhalers, in addition to Prednisone. (T. 323).

On September 3, 2013, Dr. Magurno discussed Dr. Frants's prescription and examination and stated that plaintiff had a follow-up appointment scheduled for September 19, 2013. (T. 326). Dr. Magurno also noted that plaintiff "quit smoking in 8/13." (T. 327). Dr. Magurno found that plaintiff had a frequent cough during the examination, and diminished breath sounds bilaterally, although percussion was normal. (T. 328). She also referred to a pulmonary function test and stated that "[p]oor quality tracking limits interpretation, but there is a mild obstruction." (T. 329, 331-33). Dr. Magurno also diagnosed COPD and asthma, which she noted were his "chief complaint[s]." (T. 329).

Plaintiff was examined again by Dr. Frants on September 19, 2013. (T. 345-49). Plaintiff told Dr. Frants that, although he was currently smoking, he "hardly ever smok[ed] any more - maybe just one cigarett[e] a day." (T. 345). Dr. Frants also performed pulmonary function testing, which revealed "Chronic Obstructive Asthma . . . Moderately severe at least" and COPD - "Moderately Severe." (T. 347). The report states that plaintiff should "Keep working on smoking cessation!" (*Id.*) On November 6, 2014, Dr. Freeman stated that plaintiff was a "[c]urrent every day smoker," but did not indicate how many cigarettes per day plaintiff was smoking. (T. 385). Dr. Freeman's report noted that plaintiff's COPD was "aggravated by the smoking," and that plaintiff was on "maximal medical treatment at this time." (T. 389). He was

attempting to "qualify" plaintiff for "home oxygen," and noted that there might be a sleep apnea component to plaintiff's breathing problem. (T. 389). The doctor states that plaintiff should "[p]lease stop smoking." (*Id.*) At the December 9, 2014 hearing, plaintiff testified that he had stopped smoking a month prior to the hearing, which would have been a few days after the November 6, 2014 appointment with Dr. Freeman.

It is unclear from the records, exactly how much plaintiff was smoking, but it appears that he was attempting to quit by cutting down on his consumption.[10] The ALJ did not make that observation. In *Riechi v. Barnhart*, No. 02-CV-6169, 2003 WL 21730126, at \*13 (W.D.N.Y. June 3, 2003), the ALJ found that plaintiff's continued cigarette use "despite medical advice is read by the undersigned as an indication that her COPD symptoms are mild." Based on the above, the ALJ in *Riechi* found that plaintiff's COPD was not "severe." (*Id.*)

Although in this case, the ALJ found that plaintiff's COPD was a "severe impairment," she still used the plaintiff's smoking to discount the severity of his symptoms. In *Riechi*, the court held that it was erroneous for the ALJ to find that plaintiff's failure to stop smoking means that her symptoms were mild. *Id.* The court noted that "[m]any people with disabling COPD nonetheless continue to smoke because of their addiction to nicotine . . . ." *Id.*

> Given the addictive nature of smoking, the failure to quit is as
> likely attributable to factors unrelated to the effect of smoking

---

[10] The court does note that in the records of the 2016 hospital admission, the doctor noted that plaintiff was a "current" smoker, smoking ".5" packs of cigarettes per day. (T. 34). Plaintiff had apparently increased his smoking again.

on a person's health. One does not need to look far to see persons with emphysema or lung cancer-directly caused by smoking-who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the products impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination.

*Id.* (quoting *Shramek v. Apfel*, 226 F.3d 809, 812–13 (7th Cir.2000)).

Like the plaintiff in *Riechi*, Mr. Conklin has been diagnosed with Tobacco Use Disorder. (T. 323). Tobacco Use Disorder is an impairment, whose diagnosis is contained in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), assigned to individuals who are "dependent on the drug nicotine due to the use of Tobacco products." [11] The symptoms include unsuccessful efforts to reduce the intake of tobacco. https://www.theravive.com /therapedia/tobacco-use-disorder-dsm--5-305.1-(z72.0)-(f17.200). Thus, the fact that this plaintiff did not quit smoking "sooner," is not a legitimate reason to discount his credibility regarding the severity of his symptoms, given the Tobacco Use Disorder diagnosis. Since the court is remanding for consideration of RFC and Credibility, the Commissioner should conduct a proper analysis of plaintiff's continued smoking, relative to his COPD and his credibility.

Plaintiff also argues that the ALJ's analysis of his MRI results was incorrect. To the extent that plaintiff is simply arguing that the ALJ misinterpreted the MRI results, this court does not agree. As stated above, the ALJ has clearly misinterpreted Dr. Magurno's findings which requires remand. However, the MRI results are consistent

---

[11] https://www.theravive.com/therapedia/tobacco-use-disorder-dsm--5-305.1-(z72.0)-(f17.200). DSM-5, 305.1.

with the ALJ's analysis. The ALJ cited to a December 2012 lumbar MRI which revealed minimal disc changes with no evidence of disc herniation, spinal stenosis, or significant disc bulging, and an August 2013 lumbar MRI showed minimal disc changes. (T. 87, 280, 359, 440, 441.) The ALJ correctly noted that Dr. Magurno's September 2013 report found that plaintiff had normal gait, stance, strength, and joints and had the ability to stand on heels and toes. (T. 87, 326-33). The ALJ's analysis of the objective medical evidence related to plaintiff's spinal impairment does not demonstrate an impermissible substitution of her lay opinion for that of medical testimony. Accordingly, the court finds that remand is not required on this basis.

## VIII. VE AND HYPOTHETICAL QUESTION

### A. Legal Standards

"The 'proper use of vocational testimony presupposes both an accurate assessment of the claimant's physical and vocational capabilities, and a consistent use of that profile by the vocational expert in determining which jobs the claimant may still perform.'" *Pardee v. Astrue*, 631 F. Supp. 2d 200, 211 (N.D.N.Y. 2009) (quoting *Lugo v. Chater*, 932 F. Supp. 497, 503 (S.D.N.Y. 1996)). There also "must be 'substantial evidence to support the assumption upon which the vocational expert based his opinion.'" *Pardee*, 631 F. Supp. 2d at 212 (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983)). "If a hypothetical question does not include all of a claimant's impairments, limitations, and restrictions, or is otherwise inadequate, a vocational expert's response cannot constitute substantial evidence to support a conclusion of no disability." *Id.* at 211 (citing *Melligan v. Chater*, 94-CV-944S, 1996

WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996)).

## B.   Application

As remand is required for a proper consideration of Dr. Magurno's opinion, the RFC determination in general, and the ALJ's credibility finding, the ALJ will need to, in any event, reconsider the jobs plaintiff is able to perform since Dr. Magurno's opinion, properly construed, would likely alter the RFC and may affect the jobs identified by the VE.  A revised credibility determination could also affect the ALJ's ultimate findings.

Plaintiff makes another argument relative to the hypothetical question which this court will also address, given its remand order.  The ALJ's RFC determination states plaintiff "must avoid exposure to dust, fumes, smoke, temperature extremes, and other known respiratory irritants." (T. 87).  However, the hypothetical question most closely reflecting the ALJ's RFC determination specified that the individual "must avoid *extreme* exposure to dust, fumes, smoke, temperature extremes, and other known respiratory irritants."  (T. 118) (emphasis added).  Based on the hypothetical, including the above restrictions, the VE testified that three previously identified jobs would be ruled out due to the requirement of frequent standing and walking breaks, but the VE indicated that such an individual would be able to perform other light jobs including tanning salon attendant[12]  (Dictionary of Occupational Titles ("D.O.T.") 359.567-014),

_____

[12] After reviewing both the Dictionary of Occupational Titles and the Selected Characteristics of Occupations ("SCO"), the Court was unable to find information regarding the position of tanning salon attendant by either searching the name or D.O.T. code provided by the VE.  Therefore, there is not substantial evidence that this is a valid job that plaintiff remains able to perform.  However, because the other two jobs identified by the VE (office helper and photocopy machine operator) constitute a significant number of jobs (26,550 positions and 18,145 positions nationally), any error regarding the

27

office helper (D.O.T. 239.567-010), and photocopying machine operator (D.O.T. 207.685-014). (T. 118-23.) *See also* DICTIONARY OF OCCUPATIONAL TITLES (U.S. Dep't of Labor, 4th Ed., rev. 1991).

Plaintiff argues that this hypothetical was flawed because it assumed avoidance of extreme exposure to respiratory irritants rather than any exposure to such irritants. (Dkt. No. 15, at 20-22 [Pl.'s Mem. of Law]). The ALJ clearly did not present the same environmental limitations to the VE that the ALJ stated at step four of her analysis. Plaintiff presumes that the ALJ relied on the report of Dr. Magurno as support for the hypothetical question, but plaintiff argues that Dr. Magurno did not restrict plaintiff from exposure to *extreme* respiratory irritants, but rather from exposure to any such irritants. (*Id*.) The ALJ noted that Dr. Magurno "advised the claimant to avoid exposure to dust, fumes and other lung irritants" and indicated that Dr. Magurno's findings "are consistent with pulmonary function studies." (T. 87.) The ALJ's RFC discussion does not otherwise address the distinction plaintiff draws between "extreme" and "any" exposure to respiratory irritants, nor does it address the omission of extreme from the ALJ's ultimate RFC finding. (T. 87-91.) Thus, the ALJ erred in presenting plaintiff's environmental limitations to the VE.

However, any error in the hypothetical question is harmless because the SCO indicates that the jobs described by the VE do not require *any* exposure to respiratory irritants. For both the office helper and photocopying machine operator positions, all three types of listed environmental conditions are noted to be not present," indicating

tanning salon attendant position is therefore harmless.

that exposure to any respiratory irritants is not required in these jobs. (*Id*. at Part A 07.07 and Part A 05.12.) As such, any error in formulating (and relying on) the hypothetical questions is harmless. While remand would not be required on this basis, the ALJ should clarify this aspect of her RFC analysis on remand and use hypothetical questions consistent with her RFC.

IX.   **Significant Number of Jobs at Step Five**

Because the ALJ's Step 5 findings could be affected by his error in assessing Dr. Magurno's opinion, the Court declines to address plaintiff's specific argument regarding sufficiency of jobs in the national economy, as the ALJ will need to reassess this finding on remand to account for any resulting changes in the RFC determination.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **REVERSED**, and this case is **REMANDED**, pursuant to sentence four of 42 U.S.C. § 405(g), for an appropriate analysis of plaintiff's RFC, credibility, and ability to perform substantial gainful activity as discussed above.

Dated: January 4, 2018

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**